**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DIANE ELIZABETH SACKER,

      Plaintiff,

v.                                                    Case No. 13-11278

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Diane Elizabeth Sacker brings this action pursuant to 42 U.S.C. § 405(g),

challenging Defendant Commissioner of Social Security's decision denying her

application for Disability Insurance Benefits (DIB).  Both parties have filed motions for

summary judgment.  The motions have been fully briefed, and no hearing is needed.

*See* E.D. Mich. LR 7.1(f)(2).  For the reasons stated below, the court will grant

Defendant's motion for summary judgment and deny Plaintiff's motion for summary

judgment.

**I.  BACKGROUND**

**A.  Procedural History**

In August of 2008, Plaintiff, then 48 years old, quit her job as a retail clerk at

Meijer due to her alleged physical impairments.  (AR at 28, 143.)  Approximately a year

and a half later, on April 6, 2010, Plaintiff submitted an application for DIB, alleging

disability beginning on August 1, 2008.  (*Id.* at 10.)  After the Social Security

Administration denied her claim, in September of 2010, Plaintiff requested a hearing

before an Administrative Law Judge (ALJ).  (*Id.* at 57, 68.)  After reviewing Plaintiff's file and hearing testimony from Plaintiff and vocational expert Dr. Vanessa Harris, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at 13–19.)  The ALJ's decision became the agency's final decision when the Appeals Council denied Plaintiff's request for review on January 24, 2013.  (*Id.* at 1.)  Plaintiff timely filed for judicial review of the final decision.

### B.  Medical Evidence

### 1.  Dr. Martha Frankowski

Dr. Martha Frankowski, a neurologist, has treated Plaintiff since at least April 2007.  (*Id.* at 189–90.)  Since then, Plaintiff has seen Dr. Frankowski numerous times to deal with various impairments.  Each visit will be reviewed in turn.

During a routine visit to Dr. Frankowski on April 19, 2007, Plaintiff primarily complained of headaches and tremors in her bilateral lower extremities and fingers.  (*Id.* at 190–93.)  Although the record makes no mention of when Plaintiff's headaches began, Dr. Frankowski noted during this visit that Plaintiff's headaches were improving markedly; they were occurring only four to five times a month, usually all within one week.  (*Id.*).  Dr. Frankowski noted that strong smells, stress, or fatigue, could trigger Plaintiff's headaches and that they could be "very severe and debilitating," but taking medication could prevent them from becoming so.  (*Id.* at 191.)  As such, Dr. Frankowski instructed Plaintiff to continue using Depakote and Imitrex for headache relief.  (*Id.* at 193.)  With respect to Plaintiff's complaint of tremors, Dr. Frankowski determined that they were benign, and Plaintiff declined to begin medication to treat the tremors because they were not interfering with her daily activities.  (*Id.* at 191–93.)

2

Finally, the records of this visit indicate that Plaintiff also suffered from hypertension and cervical myalgia.  (*Id.* at 190.)

Plaintiff visited Dr. Frankowski again in September of 2007 for a "neurological follow up."  (*Id.* at 195.)  During this visit, Plaintiff reported to Dr. Frankowski that her headaches were occurring only once every month, usually over a consecutive three day period.  (*Id.* at 196.)  Dr. Frankowski instructed Plaintiff to continue using Depakote and Imitrex for relief.  (*Id.* at 198.)  Plaintiff reported to Dr. Frankowski that she experienced tremors in her bilateral lower extremities when the balls of her feet were touching the ground and in her fingers when she got a manicure or used the mouse on a computer. (*Id.* at 196.)  Nonetheless, Plaintiff felt that her tremors were not sufficiently severe to require medication.  (*Id.*)

Just over a month later, on October 30, 2007, Plaintiff visited Dr. Frankowski again.  (*Id.* at 200.)  During this visit, Plaintiff stated that she could not remember the last time she had a migraine headache.  (*Id.* at 201.)  Although Plaintiff's headaches had improved, her tremor had increased.  (*Id.* at 200.)  Plaintiff had also begun taking Inderal, prescribed by her family doctor, to help with her blood pressure.  (*Id.* at 201.) Dr. Frankowski increased Plaintiff's dosage of Inderal to help control her tremors in addition to her blood pressure.  (*Id.* at 204.)

Plaintiff next saw Dr. Frankowski early the next year, on January 29, 2008.  (*Id.* at 205.)  During this examination, Plaintiff reported that her headaches were stable, occurring only three times since her last visit on October 30, 2007.  (*Id.* at 206.) However, one of the headaches was so severe that Plaintiff's husband had to take her to the emergency room.  (*Id.*)  Dr. Frankowski instructed Plaintiff to continue with her

3

current medications, and noted no changes in her tremors.  (*Id.*)  Dr. Frankowski also

discussed the possibility of adding Mysoline to Plaintiff's medications, but Plaintiff

elected to forego taking any more medication since "she believe[d] she [was] already on

'too many' medications."  (*Id.* at 208.)

Several months later, on September 24, 2008, Plaintiff visited Dr. Frankowski

again.  (*Id.* at 210.)  She complained primarily of increased headaches during this visit.

(*Id.*)  Over the previous month, Plaintiff's headaches began occurring almost daily.  (*Id.*

at 211.)  Plaintiff did not report any changes in her tremors during this visit.  (*Id.*)

About one month later, when Plaintiff visited Dr. Frankowski on October 28,

2008, her headache frequency and severity had decreased.  (*Id.* at 215.)  Plaintiff

reported that she had experienced headaches only four to five times per month, and

Imitrex usually relieved the headaches within fifteen to twenty minutes.  (*Id.*)  Plaintiff's

blood pressure was normal, but because she was experiencing intermittent dizziness,

Dr. Frankowski instructed her to decrease her Inderal and Depakote intake.  (*Id.* at 219.)

Approximately one year later, during Plaintiff's visit to Dr. Frankowski on

September 15, 2009, Plaintiff reported no changes in the characteristics of her

headaches.  (*Id.* at 220.)  At this time, her headaches were occurring approximately five

times a month over a three to five day period.  (*Id.*)  Dr. Frankowski altered Plaintiff's

medication regiment slightly.  (*Id.* at 223.)

A few months later, on February 25, 2010, Plaintiff met with Dr. Frankowski

again.  (*Id.* at 225.)  Dr. Frankowski noted that at the time of this appointment, Plaintiff

had not had a headache in several months, and her benign essential tremor was under

control.  (*Id.*)

4

In addition to her visit reports, the record contains two relevant questionnaires that Dr. Frankowski completed after Plaintiff submitted her application for DIB.  The first is a Headaches Impairment Questionnaire, dated May 23, 2011, in which Dr. Frankowski stated Plaintiff's headaches were moderately to severely intense.  (*Id.* at 273.)  Dr.  Frankowski listed the symptoms of Plaintiff's headaches as nausea/vomiting, malaise, photosensitivity, visual disturbances, mood changes, and mental confusion/inability to concentrate and the triggers of Plaintiff's headaches as chocolate, lack of sleep, stress, and weather changes.  (*Id.* at 274–75.)  Dr. Frankowski did not list anxiety as an impairment that could lead to Plaintiff's headaches.  (*Id.* at 275.)  Although Dr. Frankowski indicated that Plaintiff experienced headaches frequently and that she expected Plaintiff's headaches to last at least twelve months, she also indicated that Plaintiff could "completely relieve the pain without unacceptable side effects."  (*Id.* at 276.)  Dr. Frankowski also noted that Plaintiff was not a malingerer and that she was capable of low stress work, but she would generally be precluded from performing even basic work activities when she had a headache.  (*Id.* at 277.)

The second relevant document contained in the record is a Bilateral Dexterity Impairment Questionnaire that Dr. Frankowski completed on June 1, 2011.  (*Id.* at 280–85.)  Dr. Frankowski indicated that Plaintiff had "reduced grip strength" and a "loss of fine coordination" in both hands due to her benign essential tremor but that this posture/sustention tremor was stable with medication.  (*Id.* at 280.)  Further, Dr, Frankowski noted that Plaintiff could only lift or carry up to 5 pounds occasionally, and that stress and anxiety could increase her tremor.  (*Id.* at 282–83.)  In addition, according to the questionnaire, Plaintiff was "essentially precluded" from using her

5

fingers/hands for "fine manipulations," and was "significantly limited, but not completely precluded," from "grasping, turning or twisting objects," and using her arms for "reaching (including overhead)." (*Id.* at 284.)

### 2. Dr. Karen Beasley

Plaintiff first met with Dr. Karen Beasley, her primary care physician, on September 1, 2009. (*Id.* at 239.) During this initial visit, Dr. Beasley recorded that Plaintiff suffered from hypertension, dyslipidemia, and migraine syndrome. (*Id.*) Over the following nineteen months, Plaintiff met with Dr. Beasley several more times. (*Id.* at 294).

On September 9, 2009, Dr. Beasley recorded that Plaintiff had hypertension. (*Id.*) Less than three months later, Dr. Beasley noted that Plaintiff was suffering from plantar fasciitis and hypertension. (*Id.* at 235.) Plaintiff was given a night splint and a Medrol dosepack to help with her plantar fasciitis. (*Id.*) Several months later, on May 15, 2010, Dr. Beasley noted that Plaintiff had a bilateral lower extremity edema and continued to suffer from hypertension. The records of this visit indicate that although her legs were swelling and she had a 1 to 2+ pitting edema, Plaintiff's blood pressure was excellent. (*Id.*) Further, during this visit Plaintiff reported that after a short course of steroids, her knee was "great" and that she went on a cruise and did "beautifully" but that upon return she began experiencing knee pain again. (*Id.* at 231.) Thus, medication was injected into her knee to help alleviate the pain. (*Id.*) Just over a month later, on June 24, 2010, Dr. Beasley recorded that Plaintiff had "bilateral pedal edema secondary to medication and hypertension." (*Id.* at 294.) A few months after that, on September 1, 2010, Plaintiff complained of lower back spasms and that she moved with

6

a "significant amount of discomfort."  (*Id.* at 296.)  A radiology examination determined that Plaintiff did not have a hip fracture, but that she did suffer from degenerative arthritic alterations.  (*Id.* at 320.)  In October of 2010, records reveal that Plaintiff's blood pressure was stable but that she suffered from a contused right foot, bilateral pedal edema, afternoon nausea, and weight loss.  (*Id.* at 295.)  A radiologist's consultation report determined that Plaintiff had an "unremarkable right foot with a calcaneal spur." (*Id.* at 319.)  Over a year later, on April 19, 2011, Dr. Beasley prescribed Zoloft to help Plaintiff deal with the anxiety and depression she suffered from after her husband was diagnosed with cancer and her son was in a head-on collision.  (*Id.* at 294, 323.)  The notes of this visit indicate that Plaintiff was not suffering from headaches.  (*Id.* at 294.)

In addition to these visit reports, the record contains a Multiple Impairment Questionnaire regarding Plaintiff's conditions that Dr. Beasley completed.  (*Id.* at 255.) This questionnaire is undated, but contains a "received" facsimile timestamp of April 27, 2011.  (*Id.*)  Dr. Beasley indicated on this questionnaire that Plaintiff could not only sit for eight hours a day, but also stand/walk for eight hours a day.  (*Id.* at 257.)  Dr. Beasley noted that Plaintiff could lift or carry up to twenty pounds occasionally.  (*Id.* at 258.)  However, Dr. Beasley recorded that Plaintiff was "essentially precluded" from "grasping, turning or twisting objects"; using her fingers/hands for "fine manipulations"; and using her arms for "reaching (including overhead)."  (*Id.* at 256.)  Dr. Beasley also noted that Plaintiff was unable to write clearly.  (*Id.* at 258–59.)  Additionally, Dr. Beasley wrote that Plaintiff could not perform a "full time competitive job on a sustained basis" and that she was incapable of even "low [work] stress" because she was "very

7

anxious." (*Id.* at 260.)  Further, Dr. Beasley stated that Plaintiff would be absent from work more than three times per month as a result of her impairments. (*Id.* at 261.)

### 3. Dr. Richard Gause

The state disability determination service (DDS) hired Dr. Richard Gause to perform a consultative physical examination of Plaintiff. (*Id.* at 16.)  Dr. Gause gave Plaintiff a neurological and orthopedic supplemental examination on July 26, 2010. (*Id.* at 247–52.)  Dr. Gause determined that Plaintiff could complete every task in the examination, including walking on her heels, bending, picking up a coin, writing, and several other tasks. (*Id.* at 247–48.)  The only task Plaintiff struggled with was touching her nose with her finger because of her tremor. (*Id.* at 247.)  Dr. Gause concluded that Plaintiff had degenerative joint disease, hypertension, migraine headaches, hypothyroidism, and a benign essential tremor. (*Id.* at 251–52.)

### C. Plaintiff's Work History and Testimony

As part of her disability insurance application, Plaintiff submitted an undated work history report. (*Id.* at 143-50.)  This report indicates that Plaintiff worked three different jobs from 1998 to 2008.  From 1998 to 1999, Plaintiff worked at an elementary school, where she supervised standardized tests, attended field trips, and sent newsletters out to parents. (*Id.* at 143–44.)  Next, from 1999–2000, Plaintiff worked phone intakes for people with substance abuse problems. (*Id.* at 143, 145).  Most recently, from October 2001 until August 2008 when she quit, Plaintiff worked at Meijer. (*Id.* at 143.)  While at Meijer, one of Plaintiff's responsibilities was lifting lawn furniture, dirt, air conditioners, and other items that could weigh up to fifty pounds but typically the items she lifted weighed twenty five pounds. (*Id.* at 146.)

8

Plaintiff testified at the May 19, 2011 hearing before the ALJ about her work history and medical conditions.  She testified that she quit working at Meijer in August of 2008 because she had difficulty climbing and grasping things.  (*Id.* at 28–29.)  For example, when she worked in the pet department, Plaintiff stated that she would drop 20-pound bags "all the time," because of "shaking in her fingers."  (*Id.*)  Plaintiff testified that she normally had arm/hand tremors when she first woke up in the morning and when she was under stress.  (*Id.* at 32.)  She also reported having a leg tremor when she sat or stood in one spot for over twenty minutes.  (*Id.* at 32–33).  However, Plaintiff stated that the tremors she was experiencing at the time of the hearing were worse than the tremors she had experienced when she stopped working—her tremors were getting "worse and worse."  (*Id.* at 29.)  Plaintiff also stated that she had headaches four to six times a month that were usually relieved within two hours by medication.  (*Id.* at 35.)  Regarding her daily activities, Plaintiff testified that she could turn a doorknob and open a door, make her bed, clean up messes, cook dinner with help, do laundry, and drive when necessary.  (*Id.* at 29, 38.)  Despite these abilities, Plaintiff testified that she had trouble picking up a coin, tying her shoes, and pouring a glass of milk as well as difficulty with writing, typing, and shaving.  (*Id.* at 30–31, 38.)

### D.  Vocational Expert Dr. Vanessa Harris' Testimony

Vocational expert, Dr. Vanessa Harris, testified at the May 19, 2011 hearing before the ALJ.  (*Id.* at 44–53.)  The ALJ asked Dr. Harris the following hypothetical question:

> I'd like you to assume a hypothetical individual at the light level.  Please assume that this individual could only occasionally operate foot controls.  Please assume that this individual could never climb ladders, ropes or

9

scaffolds and would have frequent postural limitations in all other categories, meaning could not constantly do any of the other postural activities. Additionally, this individual could only occasionally do overhead reaching and handling, could only occasionally handle objects that is gross manipulation and control, only occasional finger objects, that is fine manipulation of objects no smaller than the size of a paperclip bilaterally. Additionally, this individual would need to avoid even moderate exposure to excessive vibration, would need to avoid even moderate exposure to unprotected heights. Additionally, this individual would need to be employed in a low stress job, defined as having only occasional decision making required. Would this person be able to do any of the claimant's past work?

(Id. at 45.) Dr. Harris answered "no." (Id.) Dr. Harris also testified that with the limitations provided in the hypothetical question no jobs were available in the national economy. (Id. at 47.) However, if the person could *frequently* perform "gross handling" that person could work as a binder, garment sorter, or wrapper, and at the time of the hearing 750,000 of those positions were available in the National economy and 22,000 of them were in Michigan. (Id. at 46–47.)

### D. ALJ Decision

On June 24, 2011, the ALJ determined that Plaintiff did not have a disability, as defined under the Social Security Act, from August 1, 2008 up until the date of the ALJ's decision. 20 C.F.R § 404.1520(g); (AR at 7–19.) In accordance with the Social Security Act, the ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. § 1520(a); (AR at 12-19.) At step one, the ALJ determined that Plaintiff was not engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 404.1572(a)–(b); (AR at 12.) Second, the ALJ found that Plaintiff had several "severe" impairments: migraine headaches, hypertension, essential tremor disorder, and degenerative joint disease. 20 C.F.R. § 404.1520(c); (AR at 12–13.) At step three, the ALJ found that Plaintiff did not have any impairment or

10

combination of impairments that met one of the listed impairments in 20 C.F.R. § 404,

Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; (AR at 13.) In

between steps three and four, the ALJ found that Plaintiff had the residual functional

capacity (RFC) to perform light work,[1] with some exceptions. 20 C.F.R. § 404.1520(e);

(AR at 14.) The ALJ determined that Plaintiff could:

> [L]ift, carry, push and/or pull twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk about six hours in an eight-hour workday with normal breaks; occasionally operate foot controls; never climb ladders, ropes or scaffolds; frequently climb ramps and stairs, balance, stoop, crouch, kneel and crawl; occasional overhead reaching and handling, frequently handle objects (gross manipulation); and occasional fingering (fine manipulation). In addition, the [Plaintiff] should avoid moderate exposure to excessive vibration and moderate exposure to workplace hazards, such as moving machinery and unprotected heights. Further, the [Plaintiff] is limited to low stress work, meaning only occasional decision making is required and only occasional change in the work setting.

(AR at 14.) At step four, the ALJ determined that, based on Plaintiff's RFC, Plaintiff

could not perform any "past relevant work." 20 C.F.R. §§ 404.1520(f), 404.1560,

404.1565; (AR at 17.) Finally, the ALJ found that, based on Plaintiff's RFC, age,

education, and work experience, Plaintiff could perform other work that "exists in

significant numbers in the national economy." 20 C.F.R. §§ 404.1520(g), 404.1512(g),

404.1560(c), 404.1569; (AR at 18.)

---

[1]Light work, as defined in 20 C.F.R. § 404.1567(b), requires lifting up to twenty pounds at a time, with frequent lifting or carrying of objects weighing up to ten pounds; a "good deal" of walking/standing; and some pushing/pulling of arm/leg controls.

## II.  STANDARD

### A.  Substantial Evidence Standard

The court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g).  When, as here, the Appeals Council declines review of a plaintiff's claim, the ALJ's decision becomes the final decision of the Commissioner.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

The ALJ is afforded significant deference when the court reviews the record for substantial evidence.  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Pittsburgh & Conneaut Dock Co. v. Dir., Office of Workers' Comp. Programs*, 473 F.3d 253, 259 (6th Cir. 2007), "even if that evidence could support a decision the other way," *Casey*, 987 F.2d at 1233.  Further, the court's review is based upon the entire administrative record, not just what the ALJ cited.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  However, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right," even if the decision is supported by substantial evidence.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

12

### III.  DISCUSSION

In challenging the ALJ's opinion, Plaintiff argues that the ALJ did not correctly determine Plaintiff's RFC in between steps three and four of the five-step sequential evaluation process for determining whether Plaintiff was disabled.  To support this contention, Plaintiff makes two arguments.  First she argues that the ALJ did not follow the treating physician rule and failed to afford the medical source opinions proper weight.  Second, Plaintiff argues that the ALJ did not assign sufficient weight to Plaintiff's testimony.  Each of Plaintiff's arguments will be addressed in turn.

### A.  The Treating Physician Rule

According to the treating physician rule, *see* 20 C.F.R. §§ 404.1527(c), a treating source's opinion must be given controlling weight if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record.  The regulations define a treating source :

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

20 C.F.R. § 404.1502.

If the ALJ declines to give a treating source's opinion controlling weight, she must then balance the following factors to determine what weight to give it:  the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the extent to which the physician supports his findings, the

consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(c)(2)-(5)). Social Security Regulation (S.S.R.) 96–2p states:

> [T]he adjudicator [must] always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s) . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Plaintiff argues that the ALJ did not follow the treating physician rule. Specifically, she argues that the ALJ: did not accord Dr. Frankowski's opinions significant weight (although she purported to), unfairly gave "limited weight" to Dr. Beasley's opinions, and gave Dr. Gause's opinions too much weight. The court disagrees with each of these contentions.

### 1.  Dr. Frankowski

In determining Plaintiff's RFC, the ALJ claimed to give Dr. Frankowski's opinions "significant weight as to the extent [they were] consistent with the record as a whole." (AR at 16.) Although Plaintiff does not contest the ALJ's decision not to afford Dr. Frankowski's opinion controlling weight, she does, however, contend that the ALJ did not actually afford Dr. Frankowski's opinions significant weight. (Dkt. # 11, Pg. ID 382.) Plaintiff states that the ALJ "cherry pick[ed] the limitations from Dr. Frankowski that she believed were credible without good cause or any explanation for doing so." (*Id.* at Pg. ID 383.) Specifically, Plaintiff contends that the ALJ's RFC determination did not take into account Dr. Frankowski's findings that Plaintiff had four to six headaches a month

14

that were "'frequently' severe enough to interfere with her attention and concentration," and that Plaintiff was "essentially precluded from using the upper extremities for fine manipulation and significantly limited, but not totally precluded, from using the upper extremities for grasping, turning, and twisting objects and reaching." (*Id.* (citing AR at 274, 276, 284.))  The court finds these contentions baseless; the ALJ considered many limitations noted by Dr. Frankowski, and the "significant weight" afforded to Dr. Frankowski's opinions is consistent with the ALJ's RFC finding.

In *Howard v. Commissioner of Social Security*, 276 F.3d 235 (6th Cir. 2002), the court overruled the ALJ's RFC determination where the ALJ's summary of the claimant's RFC included sections of an intake report that cast the claimant in a capable light but apparently overlooked sections from the same report that suggested the contrary. (*Id.* at 240–41.)  The case at hand, however, is distinguishable.  Here, the ALJ considered numerous limitations mentioned in Dr. Frankowski's opinions that would also support a disability holding, and not just the factors that would support a holding of not disabled.  For example, the ALJ noted that during a visit with Dr. Frankowski, Plaintiff reported frequently experiencing pain that would interfere with her ability to concentrate. (AR at 15 (citing AR at 276.))  The ALJ also referenced the Bilateral Manual Dexterity questionnaire Dr. Frankowski completed, which indicated that Plaintiff had reduced grip strength and a loss of fine coordination bilaterally.  (AR at 15 (citing AR at 280.))  In accordance with *Howard*, the ALJ considered factors from Dr. Frankowski's opinions that cast Plaintiff in a less capable light as well as those that cast her in a more capable light.

15

Further, although some omitted portions of Dr. Frankowski's opinions could suggest that Plaintiff had greater limitations than the ALJ stated in her RFC determination, other evidence from Dr. Frankowski's opinions support the ALJ's statement that she afforded Dr. Frankowski's opinions "significant weight."  In February of 2010, Dr. Frankowski recorded that Plaintiff's headaches were no longer bothersome, and her benign essential tremors were under control.  (AR at 264.)  Additionally, Dr. Frankowski noted that when Plaintiff experienced headaches, they could be controlled with medication, without unacceptable side effects.  (*Id.* at 273, 276.)  In addition, the ALJ also referenced the following opinions of Dr. Frankowski:  Plaintiff had the ability to perform low stress work (AR at 15 (citing AR at 277)), Plaintiff had normal motor strength in both her upper and lower extremities (AR at 15 (citing AR at 177)), and Plaintiff had only a "possible" increase in her symptoms with "significant repetitive reaching, handling or fingering."  (AR at 15 (citing AR at 283.)  Although some of Dr. Frankowki's opinions may appear to contradict others, it is the ALJ's duty to resolve conflicts in the medical evidence.  *Richard v. Perales*, 402 U.S. 389, 399.  Taking into consideration all of Dr. Frankowski's opinions, it is clear that the ALJ's RFC finding is consistent with her claim to have afforded Dr. Frankowski's opinions "significant weight."

### 2.  Dr. Beasley

The ALJ afforded "limited weight" to Dr. Beasley''s opinions.  (AR at 16.)  Plaintiff contends that "[t]he ALJ erred by rejecting the opinions from treating physician, Dr. Beasley," and states that the ALJ should have incorporated more of the limitations Dr. Beasley noted that Plaintiff had into the RFC determination.  (Dkt. # 11, Pg. ID 384.)  Plaintiff argues further that the ALJ erred because in declining to give a treating

16

physician's opinion controlling weight, she was obligated to explain why, citing the factors enumerated in 20 C.F.R § 404.1527(c)(2)–(5) but that "the ALJ here only indicated that she considered one factor." (*Id.*)  Specifically, Plaintiff claims Dr. Beasley's opinions deserved more than "limited weight" because she treated Plaintiff regularly over a longitudinal period, the nature of her treatment was related to treatment of Plaintiff's tremors and headaches, and she provided support for her medical opinions. (*Id.*)  The court disagrees with this conclusion.

The ALJ considered all of the factors required under 20 C.F.R. §§ 404.1527 and 416.927 when she decided not to afford Dr. Beasley's opinions controlling weight.  (AR at 16.)  The ALJ looked at the length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating physician.  (*Id.*)  The ALJ recognized that Dr. Beasley had an extensive history with Plaintiff, but explained that her opinion "[was] not supported by the evidence of record. In particular, [Dr. Beasley's opinion] states the [Plaintiff] is incapable of even a low stress job due to anxiety, however, there is no evidence of any mental health treatment or medication for anxiety."[2]  (AR at 16.)  Additionally, the ALJ noted that Dr. Beasley is not a specialist in psychiatry or neurology.  (*Id.* at 16–17.)  To that end, Plaintiff testified that Dr. Beasley did not treat her for her headaches or tremors.  (*Id.* at 36.)  Title 20 C.F.R. § 404.1527(c)(2) specifies when a *treating* source must be given controlling

---

[2]Although Plaintiff did not, the court notes that Dr. Beasley did prescribe Zoloft to help Plaintiff deal with the anxiety and depression she suffered from after her husband was diagnosed with cancer and her son was in a head-on collision.  (AR. at 294, 323.) However, the record contains no indication that Plaintiff specifically received mental health treatment of any kind.

17

weight.  Dr. Beasley cannot be classified as a *treating* source for Plaintiff's headaches and tremors, and her opinions on those impairments cannot be entitled to controlling weight.[3]  The ALJ also noted that "the claimant's tremors are taken into account in the [RFC] with the hand and foot limitations."  (AR at 17.)  The reasons the ALJ gave for affording Dr. Beasley's opinions only "limited weight" were specific and supported by substantial evidence in the record.  *See Coldiron v. Commisioner of Social Security*, 391 F. App'x. 435, 440 (6th Cir. 2010).

### 3.  Dr. Gause

The ALJ afforded Dr. Gause's opinion "significant weight."  Plaintiff contends that the ALJ improperly accorded Dr. Gause's opinions too much weight because "[t]here is no evidence that Dr. Gause could offer any unique picture of Plaintiff's functioning over a period of time," and "there is no evidence Dr. Gause is a specialist."  (Dkt. # 11, Pg. ID 385.)  The court disagrees.

Title 20 C.F.R. § 404.1527(e)(2)(ii) explains how an ALJ should interpret state agency physician opinions:

---

[3]    The SSA [classifies] acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources.  A nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case.  A nontreating source has examined the claimant, but does not have, or did not have, and ongoing treatment relationship with her.  A treating source has not only examined the claimant, but has an ongoing treatment relationship with her consistent with accepted medical practice.

*Engebrecht v. Comm'r of Soc. Sec.*, No. 13-2418, 2014 WL 3409520, at *3-4 (6th Cir. 2014) (citations omitted) (internal quotation marks omitted).  Based on the Multiple Impairment Questionnaire, Dr. Beasley *at most* could be considered a nontreating source with respect to Plaintiff's headaches and tremors.

> When an administrative law judge considers findings of a State agency medical or psychological consultant . . . the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . .

Further, reports from a source who has treated a claimant over a period of time should generally be accorded greater weight than are the reports of consultants employed and paid by the government for the purpose of defending against a disability claim.  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981).

The ALJ provided clear reasons for why she afforded Dr. Gause's opinion "significant weight."  The ALJ explicitly stated in her RFC determination that "Dr. Gause's opinion is given significant weight as he had the opportunity to personally examine the claimant.  Further, his opinion is consistent with the record as a whole."  (AR at 16.)  The reasons the ALJ gave for affording Dr. Gause's opinion substantial weight are borne out by the evidence.  First, Dr. Gause conducted a comprehensive evaluation of Plaintiff's abilities; he tested Plaintiff's physical capabilities through more than two dozen different exercises.  (*Id.* at 247–48.)  Additionally, Dr. Frankowski's notes that Plaintiff could prevent her headaches from becoming debilitating with medication (*id.* at 191), supports Dr. Gause's note that Plaintiff could obtain good relief from her headaches with medication.  (*Id.* at 251.)  Further, Dr. Gause's opinion that Plaintiff's "dexterity was unimpaired" (*id.* at 250) is in accord with Dr. Frankowski's opinion that Plaintiff's tremors were stable with medication.  (*Id.* at 280.)  In addition, Dr.

19

Gause's conclusion—that Plaintiff had degenerative joint disease, hypertension, migraine headaches, hypothyroidism, and a benign essential tremor—is consistent with the general conclusions of both Dr. Frankowski and Dr. Beasley.

Although Dr. Gause's conclusion that Plaintiff is able to write contradicts Dr. Beasley's opinion that Plaintiff had trouble writing, it is the ALJ's role to resolve such conflicting medical evidence. *Perales*, 402 U.S. at 399. Further, Plaintiff is correct in that Dr. Gause only examined Plaintiff once, and that there is no evidence on record that Dr. Gause is a specialist, yet substantial evidence still supports the ALJ's reasons for affording Dr. Gause's opinions "significant weight." Thus, even though the evidence could support a contrary decision, the ALJ's decision must be upheld. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

## B.  Plaintiff's Testimony

Plaintiff argues that substantial evidence does not support the ALJ's decision to discount her testimony. The court does not agree.

In evaluating a claimant's assertions of disabling limitations, the ALJ must utilize a two-pronged inquiry.

> First, the ALJ must examine whether there is objective medical evidence of an underlying medical condition. If there is, the ALJ must then examine whether objective medical evidence confirms the severity of the alleged pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also* S.S.R. 96-7p.

20

In addition to the objective medical evidence, the evaluation of a claimant's credibility must also take into account the following factors:

> (1) effect of symptoms on claimant's daily activities; (2) location, duration, frequency and intensity of the symptom(s); (3) factors that precipitate or aggravate claimant's symptoms; (4) type, dosage, effectiveness and side effects of medication taken to alleviate the symptom(s); (5) non-medical treatment received for relief of the symptom(s); (6) any non-treatment measures used to relieve the symptom(s); (7) other factors concerning functional limitations and restrictions due to the symptoms.

20 C.F.R. § 404.1529(c)(3)-(4); *see also* S.S.R. 96-7p.

"Furthermore, an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531. However, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* The ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the record. *Rogers,* 486 F.3d at 247–48; *see also* S.S.R. 96-7p.

In accordance with the required two-pronged inquiry, the ALJ in this case first found that there was objective medical evidence of an underlying medical condition. (AR at 14.) However, the ALJ next found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] inconsistent with the . . . [RFC] assessment." (*Id.*) Based on the medical records as a whole, Plaintiff's testimony concerning her alleged limitations, and the opinion evidence, the ALJ concluded that Plaintiff's "subjective complaints and alleged limitations [were] not fully persuasive." (*Id.* at 17.)

Plaintiff's objection to the evaluation of her credibility relies heavily on *Rogers*. (Dkt. # 11, Pg. ID 388.)  In *Rogers*, the court held that "the ALJ's consideration of Roger's subjective pain complaints and assessment of her credibility [did] not comport with the Administration's requirements," because "the ALJ failed to discuss or consider the lengthy and frequent course of medical treatment or the nature and extent of that treatment, the numerous medications Rogers ha[d] been prescribed, the reasons for which they were prescribed, or the side effects Rogers testified she experience[d] from those medications."  *Rogers*, 486 F.3d at 248 The ALJ additionally erred by "failing to note or comment upon that fact that Rogers receive[d] assistance for many everyday activities and even personal care from her children, who live close by."  *Id.*  The ALJ further erred in discrediting the claimant's testimony and relying upon one doctor's testimony that the best treatment for fibromyalgia is regular exercise, albeit ignoring the fact that some activities could aggravate the claimant's symptoms.  *Id.* at 249.

The ALJ's decision to discredit Plaintiff's testimony is supported by evidence in the case record.  Contrary to the scenario in *Rogers*, the ALJ observed numerous contradictions in Plaintiff's testimony.  (*Id.* at 15, 17.)  For example, Plaintiff testified that she can only walk a couple blocks, but had earlier indicated she could walk a mile without problems.  (*Id.* at 33; *id.* at 156.)  In addition, the ALJ referenced the inconsistency between Plaintiff's complaints about her foot and her need to wear a splint only during the night.  (AR at 15 (citing AR at 157.))  The ALJ also noted that Plaintiff complained of high blood pressure and headaches, but these impairments were reportedly resolved.  (AR at 15 (citing AR at 201, 219, 225, 230, 294-95.))  And, even if Plaintiff's headaches were still occurring, Dr. Frankowski had previously noted that

22

Plaintiffs headaches could be alleviated by medication without unacceptable side effects.  (*Id.* at 276.)

Plaintiff's testimony regarding her alleged limitations was also inconsistent with her active lifestyle.  Plaintiff was able to go on a cruise in 2010 and "did beautifully," according to Dr. Beasley.  (*Id.* at 230.)  Additionally, Plaintiff had the capacity to perform many daily activities.  Plaintiff reported making breakfast, dusting, paying bills and managing funds, going grocery shopping, doing laundry, and taking care of her dog. (*Id.* at 15, 152–55.)  Although Plaintiff may have needed assistance to perform some of these daily tasks (*id.* at 38), this does not mean that the ALJ erred in considering them. Even if Plaintiff's contentions that the ALJ mischaracterized the lifestyle about which Plaintiff testified were true, the many inconsistencies between Plaintiff's testimony and the objective medical evidence justifies the ALJ's decision to discredit Plaintiff's testimony.  *See Walters*, 127 F.3d at 531 ("[T]he Commissioner has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record . . . Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.")

Contrary to Plaintiff's position, it is evident that the ALJ's decision to discredit Plaintiff's subjective complaints was not based on intangible or intuitive notions about Plaintiff's credibility, but was instead supported by specific reasons borne out by the substantial evidence contained in the record.  Her decision was in accord with the relevant regulations, and it is therefore entitled to "great weight and deference," and will not be overturned.  S.S.R. 96-7p; *Walters*, 127 F.3d at 531.

23

In sum, the ALJ complied with the treating physician rule and properly weighed the medical source opinions of doctors Frankowski, Beasley, and Gause. The ALJ also appropriately credited Plaintiff's testimony. Substantial evidence supports the ALJ's decision to deny Plaintiff disability insurance benefits.

## IV.  CONCLUSION

Accordingly, IT IS ORDERED Defendant's motion for summary judgment (Dkt. # 14) is GRANTED and that Plaintiff's motion for summary judgment (Dkt. # 11) is DENIED.

A separate judgment will issue.

      s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 31, 2014


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 31, 2014, by electronic and/or ordinary mail.

      s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\13-11278.SACKER.MSJ.final.wpd